IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:24-CV-81-D

| | | |
|---|---|---|
| ANTHONY TATUM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| X CORP., et al., | ) | |
| | ) | |
| Defendants. | ) | |

On January 5, 2024, Anthony Tatum ("Tatum" or "plaintiff"), proceeding pro se, filed a complaint against X Corp. ("X") and Elon Musk ("Musk") in Pender County Superior Court [D.E. 1-1]. On January 16, 2024, Tatum amended his complaint and added five pseudonymous defendants (collectively, with X and Musk, "defendants") [D.E. 1-2]. Tatum's amended complaint alleges a products-liability claim in violation of N.C. Gen. Stat. § 99B-5 against X and a negligence claim against Musk. See id. On February 12, 2024, X removed the action to this court [D.E. 1].

On February 20, 2024, X moved to dismiss Tatum's claim against it for failure to state a claim upon which relief may be granted [D.E. 6] and filed a memorandum in support [D.E. 6-1]. See Fed. R. Civ. P. 12(b)(6).[1] The same day, X also asked the court to take judicial notice of X's terms of service [D.E. 7]. On February 22, 2024, the court notified Tatum about the motion to dismiss, the consequences of failing to respond, and the response deadline [D.E. 8]. See Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam). On March 5, 2024, Tatum responded

---

[1] X argues Tatum fails to plausibly allege a negligence claim against it. See [D.E. 6-1] 23–25, 27–28. Tatum confirms that he alleges a negligence claim only against Musk. See [D.E. 11] 6. Accordingly, the court does not consider a negligence claim against X.

in opposition [D.E. 11]. On March 12, 2024, Tatum filed a declaration in support of his response [D.E. 13]. On March 19, 2024, X replied [D.E. 14]. As explained below, the court grants X's motion for judicial notice, grants X's motion to dismiss, and dismisses with prejudice Tatum's claim against X.

I.

X is an American technology company that owns and operates the social media platform formerly known as Twitter. See Am. Compl. [D.E. 1-2] ¶¶ 4, 12. Musk is X's majority owner, Executive Chairman, and Chief Technology Officer ("CTO"). See id. at ¶ 5. At all relevant times, Tatum operated X accounts @anthonytatum69 and @heliosnn. See id. at ¶¶ 3, 25.

Tatum alleges that Musk "tweeted that he was donating $100 million" to the XPrize Gigaton CO2 Removal competition ("XPrize"). Id. at ¶ 28. In September 2021, Tatum left his job to "focus[] entirely on the XPrize." Id. at ¶ 29. In April 2022, "[d]ue to loss of income," Tatum sold his house and moved to Florida to continue working on the XPrize and find another job. Id. at ¶ 30. Tatum did not win XPrize and could not find another job. See id. at ¶ 31.

Tatum's XPrize partner suggested that Tatum begin writing code to predict the stock market using artificial intelligence ("A.I.") and machine learning. See id. at ¶ 32. Tatum began developing such code and "shared these developments on X." Id. at ¶¶ 33–34. Tatum used X "to meet people and build relationships and business opportunit[ies]" concerning his code. Id.; see id. at ¶ 36. According to Tatum, Musk "encouraged" Tatum's code development via "sub tweeting," which is when an X user makes "a post that refers to a particular user without directly mentioning them." Id. at ¶¶ 25, 34. During this time, Tatum alleges he also interacted with the pseudonymous defendants on X. See id. at ¶ 38. At some point, Tatum "began noticing that his computer and some of his remote servers were acting strange." Id. at ¶ 40. For example, "his website was

2

crashing unexpectedly, program libraries were changing, private SSH keys stopped working[,] and his laptop memory was randomly reaching capacity and changing." Id. Tatum "suspect[s]" that the pseudonymous defendants hacked him. Id. at ¶ 41.

On May 15, 2023, Orion180, an insurance company, hired Tatum as an accounting analyst. See id. at ¶ 42. During his employment, Tatum "noticed some vulnerability" in Orion180's software "that could present insurance agents with the potential for fraud." Id. According to Tatum, because of his "personal security breach," his "knowledge of the fraud vulnerability at Orion180" presented "a potential for entrapment or a setup." Id. at ¶ 43. Tatum notified Orion180 of its potential vulnerability and "requested a signed legal statement releasing [Tatum] from liability due to this knowledge." Id. at ¶¶ 43–44. Orion180 refused Tatum's request and terminated Tatum's employment. See id. at ¶ 44.

On May 25, 2023, new neighbors moved into the apartment below Tatum's apartment in Florida. See id. at ¶ 46. Tatum noticed "extreme mood changes and emotional distress in his wife and children immediately after the new neighbors moved in." Id. at ¶ 47. Tatum's wife "exhibited emotional distress for approximately 10 days." Id. at ¶ 48. Tatum's two-year old daughter displayed "excessive signs of distress such as pointing to her head and crying, acting confused and depressed, screaming excessively, waking up with night terrors, and more." Id. at ¶ 49. Afterwards, Tatum alleges that he broke his lease on his Florida apartment and moved back to Pender County, North Carolina, due to his loss of income after Orion180 terminated his employment. See id. at ¶ 45. Once he returned to North Carolina, Tatum "visited the emergency room regarding his own symptoms of heart pain." Id. at ¶ 51.

Tatum alleges that X and Musk's actions have caused him damages including lost wages, moving expenses, "payment of outstanding lease," medical expenses, and "[p]hysical and

3

emotional harm." Id. at ¶¶ 60, 63. Tatum seeks compensatory damages to cover lost wages, compensatory damages "for having to vacate the apartment due to financial and health concerns," compensatory damages for medical expenses, punitive damages for negligence, and any other relief the court deems "just and proper." Id. at 11–12.

II.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to [the nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a plaintiff's factual allegations must "nudge[] [his] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

"Determining whether a complaint states a plausible claim for relief . . . [is] a context specific task that requires the reviewing court to draw on judicial experience and common sense."

4

Iqbal, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint does not suffice. Id.

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011); see Fed. R. Civ. P. 10(c); Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165–66 (4th Cir. 2016); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court also may consider a document submitted by a moving party if it is "integral to the complaint and there is no dispute about the document's authenticity" without converting the motion into one for summary judgment. Goines, 822 F.3d at 166. "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails." Id. (quotation omitted); see Fayetteville Invs. v. Com. Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991). Additionally, a court may take judicial notice of public records. See, e.g., Fed. R. Evid. 201; Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

X asks the court to take judicial notice of its terms of service and contends that the terms of service bar Tatum's claims. See [D.E. 6-1] 15–18; [D.E. 7] 2. X attached archived copies of its terms of service which were publicly available. See [D.E. 7-2 to 7-5]. X argues its terms of service "are properly subject to judicial notice because their contents are not subject to reasonable dispute." [D.E. 7] 4. Tatum does not oppose X's request for judicial notice.

Under Federal Rule of Evidence 201(b), the court "may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Courts may judicially notice information, including archived information, from publicly available websites. See, e.g.,

5

Valve Corp. v. Ironburg Inventions Ltd., 8 F.4th 1364, 1374 (Fed. Cir. 2021); Thomas v. SC Dep't of Health, Civ. No. 3:20-1333, 2023 WL 3853432, at *3–4 (D.S.C. June 6, 2023) (unpublished); Power Home Solar, LLC v. Sigora Solar, LLC, No. 3:20-CV-42, 2021 WL 3856459, at *6 & n.3 (W.D. Va. Aug. 30, 2021) (unpublished); Prudential Ins. Co. of Am. v. PRU.COM, 546 F. Supp. 3d 476, 481 & n.8 (E.D. Va. 2021), aff'd sub nom. Prudential Ins. Co. of Am. v. Shenzhen Stone Network Info. Ltd., 58 F.4th 785 (4th Cir. 2023); Cvent, Inc. v. Eventbrite, Inc., 739 F. Supp. 2d 927, 937 & n.2 (E.D. Va. 2010). Accordingly, the court grants X's motion and takes judicial notice of X's terms of service. See, e.g., Yuksel v. Twitter, Inc., No. 22-CV-5415, 2022 WL 16748612, at *2–3 (N.D. Cal. Nov. 7, 2022) (unpublished); Lloyd v. Facebook, Inc., No. 21-CV-10075, 2022 WL 4913347, at *4 (N.D. Cal. Oct. 3, 2022) (unpublished) (collecting cases); Bus. Casual Holdings, LLC v. YouTube, LLC, No. 21-CV-3610, 2022 WL 837596, at *1 n.2 (S.D.N.Y. Mar. 21, 2022) (unpublished); Jones v. Twitter, Inc., Civ. No. 20-1963, 2020 WL 6263412, at *1 n.2 (D. Md. Oct. 23, 2020) (unpublished).[2]

X argues that its terms of service require California law to govern any dispute between the parties. See [D.E. 6-1] 14–15. Tatum responds that "[t]here does not appear to be a conflict of policy or law between North Carolina [l]aw and California [l]aw that would interfere with [j]ustice." [D.E. 11] 3; see id. at 6 (Tatum "awaits this [c]ourt's decision as to which [s]tate[']s law to apply").

North Carolina enforces contractual choice-of-law provisions as long as the parties "had a reasonable basis for their choice and the law of the chosen State does not violate a fundamental

---

[2] The court agrees with X that it may take judicial notice of X's terms of service. Thus, the court need not reach X's argument that the court may consider X's terms of service because Tatum incorporated by reference X's terms of service in his complaint. See [D.E. 7] 6–7.

6

public policy of [North Carolina] or otherwise applicable law." Sawyer v. Mkt. Am., Inc., 190 N.C. App. 791, 794, 661 S.E.2d 750, 752 (2008) (quotation omitted); see N.C. Gen. Stat. § 25-1-301; Tanglewood Land Co. v. Byrd, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980); Torres v. McClain, 140 N.C. App. 238, 241, 535 S.E.2d 623, 625 (2000). At all relevant times, X's terms of service stated that the "laws of the State of California, excluding its choice of law provisions, will govern . . . any dispute that arises between [the user] and Twitter." [D.E. 7-2] 4; see [D.E. 7-3] 4; [D.E. 7-4] 8; [D.E. 7-5] 4; see also Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 628 (4th Cir. 1999) (holding that, where a choice-of-law provision called for the application of Virginia law to "the rights and obligations of the parties hereunder," the "choice of law language . . . indicates that the parties intended to cover more than merely contract claims").

"In North Carolina, product liability actions are governed by statute." Pa. Nat'l Mut. Cas. Ins. Co. v. STIHL Inc., No. 7:23-CV-18, 2023 WL 5029142, at *3 (E.D.N.C. Aug. 7, 2023) (unpublished). Generally, a plaintiff cannot bring claims arising under one state's law if he contracted for a different state's law to govern his dispute. See, e.g., Troublefield v. AutoMoney, Inc., 284 N.C. App. 494, 506–07, 876 S.E.2d 790, 800 (2022), disc. rev. denied, 884 S.E.2d 739 (N.C. 2023). Thus, the court conducts a conflict of law analysis to determine whether the choice-of-law provision in X's terms of service, which specifies California law, precludes Tatum from bringing a North Carolina statutory products-liability claim. See, e.g., Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., 386 F.3d 581, 606–10 (4th Cir. 2004); Troublefield, 284 N.C. App. at 506–07, 876 S.E.2d at 800; Hundley v. AutoMoney, Inc., 284 N.C. App. 378, 387–89, 876 S.E.2d 765, 773–74 (2022), disc. rev. denied, 884 S.E.2d 737 (N.C. 2023).

Choice-of-law provisions are not "binding on the interpreting court" in North Carolina if the law of the chosen state "violate[s] a fundamental policy" of North Carolina. Cable Tel Servs.,

7

Inc. v. Overland Contracting, Inc., 154 N.C. App. 639, 643, 574 S.E.2d 31, 34 (2002); see Volvo Constr. Equip. N. Am., Inc., 386 F.3d at 607; Lindemann-Moses v. Jackmon, 644 F. Supp. 3d 163, 171 (M.D.N.C. 2022); Vizant Techs., LLC v. YRC Worldwide, Inc., 373 N.C. 549, 556, 838 S.E.2d 616, 620 (2020) (per curiam); Leake v. AutoMoney, Inc., 284 N.C. App. 389, 401–02, 877 S.E.2d 22, 33–34 (2022). Thus, the court "must determine whether [N.C. Gen. Stat. § 99B-5] constitutes a 'fundamental public policy' . . . as to invalidate" X's choice-of-law provision. Leake, 284 N.C. App. at 402, 877 S.E.2d at 34.

In Mooney v. Wood/Chuck Chipper Corp., No. 1:99CV207, 2000 WL 33422744, at *2 (W.D.N.C. Feb. 4, 2000) (unpublished), the court held that North Carolina's choice-of-law rules dictated that Georgia products-liability law governed plaintiff's claims. See id. The defendant contended North Carolina products-liability law should apply because Georgia's products-liability law conflicted with North Carolina law and violated the public policy of North Carolina. See id. The court, however, concluded that it had "no reason to depart from the well-settled choice-of-law rule in North Carolina, lex loci, and that such application" to plaintiff's claims did "not offend the public policy of the State of North Carolina." Id.

In Gbye v. Gbye, 130 N.C. App. 585, 588, 503 S.E.2d 434, 436 (1998), the North Carolina Court of Appeals described Terry v. Pullman Trailmobile, 92 N.C. App. 687, 376 S.E.2d 47 (1989). In Terry, the "plaintiff brought suit in [North Carolina] for injuries sustained while using a defective product manufactured in New York." Gbye, 130 N.C. App. at 588, 503 S.E.2d at 436. The court in Gbye noted that "it was indeed proper to apply New York's law regarding . . . strict liability [product-liability] claims, even though the North Carolina General Assembly had expressly rejected the doctrine of strict liability in product liability actions by way of N.C. Gen. Stat. § 99B-1.1." Id., 503 S.E.2d at 436.

8

These cases demonstrate that a court should apply the products-liability law arising from North Carolina's choice-of-law rules, even if the other state's products-liability law is different. Neither party cites, and the court has not located, any North Carolina appellate cases to the contrary. Moreover, sitting in diversity, this court may not "create or expand" North Carolina's public policy. Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (quotation omitted); see Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999). Accordingly, North Carolina's products-liability statutes do not codify "fundamental public policy" of North Carolina.

North Carolina would enforce X's choice-of-law provision. See Tanglewood Land Co., 299 N.C. at 262, 261 S.E.2d at 656; Sawyer, 190 N.C. App. at 794, 661 S.E.2d at 752; Torres, 140 N.C. App. at 241, 535 S.E.2d at 625. Accordingly, California law applies to Tatum's products-liability claim against X. See [D.E. 7-2] 4; [D.E. 7-3] 4; [D.E. 7-4] 8; [D.E. 7-5] 4. Thus, Tatum cannot bring his North Carolina statutory inadequate-warning claim against X. See, e.g., Volvo Constr. Equip. N. Am., Inc., 386 F.3d at 609.

Alternatively, even if Tatum could bring an inadequate-warning claim against X, "[l]imitation of liability clauses have long been recognized as valid in California," particularly "when one party is offering a service for free to the public." Lewis v. YouTube, LLC, 244 Cal. App. 4th 118, 125, 197 Cal. Rptr. 3d 219, 224 (2015) (quotation omitted). The same principle applies in North Carolina. See, e.g., Gas House, Inc. v. S. Bell Tel. & Tel. Co., 289 N.C. 175, 180–85, 221 S.E.2d 499, 503–06 (1976), overruled in part on other grounds by State ex rel. Utils. Comm'n v. S. Bell Tel. & Tel. Co., 307 N.C. 541, 299 S.E.2d 763 (1983).

9

In its terms of service, X "disclaim[ed] all responsibility and liability for . . . any harm to [the user's] computer system . . . or other harm that results from [the user's] access to or use of" Twitter. [D.E. 7-2] 3; see [D.E. 7-3] 3; [D.E. 7-4] 3, 8; [D.E. 7-5] 3. Moreover, X's terms of service state that X "shall not be liable for any indirect, incidental, special, consequential[,] or punitive damages . . . resulting from . . . [the user's] access to or use of . . . the services [or] any conduct or content of any third party on the services, including . . . illegal conduct of other users or third parties." [D.E. 7-2] 4 (capitalization omitted); see [D.E. 7-3] 4; [D.E. 7-4] 4, 8; [D.E. 7-5] 4. This liability limitation "appl[ies] to any theory of liability, whether based on . . . statute, tort (including negligence) or otherwise." [D.E. 7-2] 4 (capitalization omitted); see [D.E. 7-3] 4; [D.E. 7-4] 4, 8; [D.E. 7-5] 4.

Tatum alleges X inadequately warned him about the presence of dangerous users on Twitter, and he suspects some of those users hacked his computer. See Am. Compl. ¶¶ 38–41, 58. Thus, Tatum's claim falls squarely within X's limitation of liability clauses. See [D.E. 7-2] 3–4; [D.E. 7-3] 3–4; [D.E. 7-4] 3–4, 8; [D.E. 7-5] 3–4. Absent plausible allegations that X's limitation of liability provisions are unconscionable, Tatum cannot assert this claim against X regardless of whether California or North Carolina law applies to his claim. See, e.g., Gerber v. Twitter, Inc., No. 4:23-CV-186, 2024 WL 1354449, at *4–5 (N.D. Cal. Mar. 29, 2024) (unpublished); Exclusive Jets, LLC v. A1 Aviation, LLC, No. 4:22-CV-151, 2024 WL 962306, at *6 (E.D.N.C. Jan. 5, 2024) (unpublished); Abdulaziz v. Twitter, Inc., No. 19-CV-6694, 2021 WL 633812, at *7–8 (N.D. Cal. Feb. 18, 2021) (unpublished); Murphy v. Twitter, Inc., 60 Cal. App. 5th 12, 35–38, 274 Cal. Rptr. 3d 360, 377–80 (2021).

Alternatively, assuming without deciding Tatum could bring an inadequate-warning claim against X under N.C. Gen. Stat. § 99B-5, Tatum must plausibly allege "that the defendant

10

unreasonably failed to provide an adequate warning, such failure was the proximate cause of the plaintiff's damages, and the product posed a substantial risk of harm without an adequate warning either at the time of or after leaving the manufacturer's control." Asby v. Medtronic, Inc., 673 F. Supp. 3d 787, 794 (E.D.N.C. 2023) (quotation omitted); see N.C. Gen. Stat. § 99B-5(a); Carlson v. Bos. Sci. Corp., 856 F.3d 320, 324 (4th Cir. 2017); Evans v. Evans, 153 N.C. App. 54, 57–58, 569 S.E.2d 303, 308 (2002).

Tatum merely "suspect[s]" that other Twitter users hacked his computer. Am. Compl. ¶ 41. Accordingly, Tatum does not plausibly allege proximate causation. See, e.g., Iqbal, 556 U.S. at 679; Riley v. Bartlett, Civ. No. 6:14-350, 2014 WL 4746289, at *5 (D.S.C. Aug. 13, 2014) (unpublished) ("The plaintiff's suspicion of misconduct . . . alone is insufficient to raise a right to relief above the speculative level and to state a plausible claim for relief."), report and recommendation adopted by 2014 WL 4417708 (D.S.C. Sept. 8, 2014) (unpublished), aff'd, 615 F. App'x 794 (4th Cir. 2015) (per curiam) (unpublished); Lynch v. U.S. Att'y Gen., Civ. No. 3:06-148, 2008 WL 3852140, at *2 (S.D.W. Va. Aug. 14, 2008) (unpublished). Moreover, Tatum fails to plausibly allege that his computer's erratic behavior injured him. Cf. Copart, Inc. v. Sparta Consulting, Inc., 277 F. Supp. 3d 1127, 1162 (E.D. Cal. 2017). Tatum seeks damages from X for lost wages, moving expenses, medical expenses, physical harm, and emotional harm. See Am. Compl. ¶ 60. Tatum, however, fails to plausibly connect his allegations of medical expenses and emotional distress to X's conduct or other Twitter users' conduct. See id. at ¶¶ 46–51. Moreover, Tatum's lost wages and moving expenses (including his broken lease) resulted from his own conduct. See id. at ¶¶ 29–31, 43–45. Accordingly, Tatum fails to plausibly allege a claim against X under N.C. Gen. Stat. § 99B-5. See Asby, 673 F. Supp. 3d at 794. Thus, the court grants X's motion to dismiss count one.

11

Alternatively, assuming without deciding Tatum may bring a products-liability claim against X under California law, Tatum must plausibly allege "a failure to warn, causation, and injury" to state a strict liability inadequate-warning claim against X. Nelson v. Super. Ct., 144 Cal. App. 4th 689, 695, 50 Cal. Rptr. 3d 684, 687 (2006) (quotation omitted). To state a negligent inadequate warning claim against X under California law, Tatum must plausibly allege the same elements plus "an additional element, namely, that the defect in the product was due to the negligence of the defendant." Trejo v. Johnson & Johnson, 13 Cal. App. 5th 110, 125, 220 Cal. Rptr. 3d 127, 140 (2017). Tatum's failure to plausibly allege causation or damages also dooms his claim under California law. See id. Accordingly, the court dismisses count one.

X asks the court to dismiss Tatum's claim against it with prejudice. See [D.E. 6-1] 28. Tatum seeks leave to amend. See [D.E. 11] 6 ("Plaintiff . . . offers to amend the Complaint to deal with any deficiencies."). Whether to dismiss a claim with or without prejudice "is within the district court's discretion." Carter v. Norfolk Cmty. Hosp. Ass'n, Inc., 761 F.2d 970, 974 (4th Cir. 1985); see In re PEC Sols., Inc. Sec. Litig., 418 F.3d 379, 391 (4th Cir. 2005). "[D]ismissal with prejudice is proper if there is no set of facts the plaintiff could present to support his claim." Weigel v. Maryland, 950 F. Supp. 2d 811, 826 (D. Md. 2013); see Cozzarelli v. Inspire Pharms., Inc., 549 F.3d 618, 630 (4th Cir. 2008). The court has reviewed Tatum's amended complaint and the record. Any further amendment would be futile. Accordingly, the court dismisses with prejudice count one.

III.

In sum, the court GRANTS defendant X's motion for judicial notice [D.E. 7] and motion to dismiss [D.E. 6] and DISMISSES WITH PREJUDICE count one from plaintiff's complaint.

SO ORDERED. This 13 day of May, 2024.

                                                      JAMES C. DEVER III
                                                     United States District Judge